**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| COBALT INTERNATIONAL ENERGY, INC., | § § § | |
| Plaintiff, | § § | |
| and | § § | |
| JACK E. GOLDEN, JON A. MARSHALL, D. JEFF VAN STEENBERGEN, MYLES W. SCOGGINS, MARTIN H. YOUNG, WILLIAM P. UTT, KENNETH W. MOORE, JR., JAMES W. FARNSWORTH, JOSEPH H. BRYANT, JOHN P. WILKIRSON, J. HARDY MURCHISON, PETER R. CONEWAY, N. JOHN LANCASTER, JR., HENRY CORNELL, AND KENNETH A. PONTARELLI, | § § § § § § § § § § § § § § § § § | **C.A. NO. 4:17-cv-01450** |
| Intervenor – Plaintiffs, | § § | |
| v. | § § | |
| ILLINOIS NATIONAL INSURANCE COMPANY AND AXIS INSURANCE COMPANY, | § § § | |
| Defendants. | § § | |

<u>Cobalt's Fourth Amended Petition</u>

Plaintiff Cobalt International Energy, Inc. ("Cobalt") files this fourth amended petition against defendants Illinois National Insurance Company ("Illinois National") and Axis Insurance Company ("Axis"):

<u>Parties</u>

1.      Cobalt is a Delaware corporation with its principal place of business in Harris County, Texas.

2.      Intervenor-plaintiff Jack E. Golden is a current Director of Cobalt and a resident of Texas.

3.      Intervenor-plaintiff Jon A. Marshall is a current Director of Cobalt and a resident of Texas.

4.      Intervenor-plaintiff D. Jeff van Steenbergen is a current Director of Cobalt and a resident of Alberta, Canada.

5.      Intervenor-plaintiff Myles W. Scoggins is a current Director of Cobalt and a resident of Colorado.

6.      Intervenor-plaintiff Martin H. Young, Jr. is a current Director of Cobalt and a resident of Texas.

7.      Intervenor-plaintiff William P. Utt is a current Director of Cobalt and a resident of Texas.

8.      Intervenor-plaintiff Kenneth W. Moore is a current Director of Cobalt and a resident of Connecticut.

9.      Intervenor-plaintiff James W. Farnsworth is a current Officer of Cobalt and a resident of Texas.

10.     Intervenor-plaintiff Joseph H. Bryant is a former Director and Officer of Cobalt and a resident of Texas.

11.     Intervenor-plaintiff John P. Wilkirson is a former Officer of Cobalt and a resident of Texas.

12.     Intervenor-plaintiff J. Hardy Murchison is a former Director of Cobalt and a resident of Texas.

13.     Intervenor-plaintiff Peter R. Coneway is a former Director of Cobalt and a resident of Texas.

14.     Intervenor-plaintiff N. John Lancaster, Jr. is a former Director of Cobalt and a resident of Connecticut.

15.     Intervenor-plaintiff Henry Cornell is a former Director of Cobalt and a resident of New York.

16.     Intervenor-plaintiff Kenneth A. Pontarelli is a former Director of Cobalt and a resident of New York.

17.     Illinois National is an Illinois corporation with, as Illinois National maintains, its principal place of business in New York.  Illinois National does business in the state of Texas and may be served through its registered agent for service of process in Texas: United States Corporation Company, 211 East 7th Street, Suite 620, Austin, Texas 78701-3218.

18.     Axis is an Illinois corporation with its principal place of business in Georgia.  Axis does business in the state of Texas and may be served through its registered agent for service of process in Texas: Corporation Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701-3218.

Jurisdiction and Venue

19.     The Harris County District Courts have subject matter jurisdiction over this dispute because the amount in controversy exceeds their minimum jurisdictional requirement exclusive of interest and costs.  Cobalt seeks monetary relief over $1,000,000.  This Court, however, lacks subject-matter jurisdiction to hear this dispute because there is no federal question raised by plaintiffs' complaint and there is not complete diversity among the parties.  Pursuant to 28 U.S.C. § 1332(c)(1), defendant Illinois National is deemed a citizen of New York for diversity purposes.  Intervenor-plaintiffs Henry Cornell and Kenneth A. Pontarelli are also citizens of New York.  Therefore, there is not complete diversity among the parties.

20.     This Court – like the Harris County District Court – has personal jurisdiction over Illinois National because Illinois National has purposefully availed itself of the benefits of conducting business in Texas by entering into contracts with Cobalt that were to be performed in whole or in part in Texas.  *See* TCPRC § 17.042.

21.     This Court – like the Harris County District Court – has personal jurisdiction over Axis because Axis has purposefully availed itself of the benefits of conducting business in Texas by entering into contracts with Cobalt that were to be performed in whole or in part in Texas.  *See* TCPRC § 17.042.

22.     Harris County is a proper venue because a substantial part of the events or omissions giving rise to the claims against Illinois National and Axis occurred in Harris County.  *See* TCPRC § 15.002.

<u>Facts</u>

A.     <u>Summary of Cobalt's Insurance Coverage and the Claims Made Against Cobalt</u>

23.     Cobalt is a publicly traded independent exploration and production company with operations in the deepwater Gulf of Mexico and offshore Angola and Gabon in West Africa. Cobalt procures management liability insurance to protect Cobalt and its directors and officers in the event of, among other things, government investigations and private lawsuits.

24.     In 2007, Cobalt acquired a 40% interest in three development blocks offshore of Angola (Blocks 9, 20, and 21).  The Angolan government subsequently assigned interests in two of the three blocks (Blocks 9 and 21) to Nazaki Oil and Gas ("Nazaki") and two other Angolan companies.

25.     Between 2010 and 2014, Cobalt had two primary insurers: XL (2010-2012) and Illinois National (2012-2014).  This case is about XL and Illinois National's improper denial of insurance coverage.

26.     Two different groups of claims made against Cobalt are at issue in this case.  The first involves Cobalt's relationship with Nazaki and Nazaki's purported association with senior Angolan government officials (the "Nazaki Claims").  The Nazaki Claims accrued when XL was Cobalt's primary insurer, and therefore Cobalt is entitled to coverage for the Nazaki Claims under its insurance agreements with XL (the "XL Policies").  XL has improperly denied coverage for the Nazaki Claims based on factually incorrect and legally flawed assertions about the notice Cobalt provided to XL.

27.     The second, and separate, group of claims relates to Cobalt's disclosures about two wells that Cobalt drilled in 2013 and 2014 (the "Well Disclosure Claims").  The Well Disclosure Claims accrued after Cobalt ended its coverage with XL and during the period of time when Illinois National was Cobalt's primary insurer.  The Well Disclosure Claims are therefore covered by Cobalt's insurance policies with Illinois National (the "Illinois National Policies").

28.     Illinois National has improperly denied coverage for the Well Disclosure Claims based on the false assertion that these disclosures somehow relate to Nazaki, even though Nazaki owned no interest in one of the wells and had

transferred its potential interest in the other before the disclosure of drilling results. It is clear that Nazaki had no role whatsoever in the disclosures. Moreover, Illinois National has continued to deny coverage even after Cobalt demonstrated to Illinois National that the Well Disclosure Claims are not related in any way to Nazaki or to the circumstances surrounding the Nazaki Claims.

B.     Cobalt Obtains Insurance Coverage from XL

29.     Effective December 15, 2010, XL and Cobalt entered into a claims made "Management Liability and Company Reimbursement Insurance Policy," policy number ELU119786-10, a true and correct copy of which is attached as Exhibit A. Cobalt renewed its coverage from XL in December 2011, and XL continued to serve as Cobalt's primary insurer through December 15, 2012.

30.     Section I of the XL Policies includes within coverage, among other things, "Loss resulting from a Claim first made against the Insured Persons during the Policy Period or, if applicable, the Optional Extension Period" and "Loss resulting solely from any Securities Claim first made against the Company during the Policy Period or, if applicable, the Optional Extension Period, for a Company Wrongful Act," without any requirement that the Claim also be reported to XL during the Policy Period or Optional Extension Period.

31.     Section VI(A)(2) of the XL Policies treats "as if it had been first made during the Policy Period" any Claim made against Cobalt (or an Insured Person)

*after* the Policy Period, if during the Policy Period Cobalt learned of and notified XL of the circumstances potentially giving rise to that Claim.[1]

32.    The 2010-2011 XL policy provides $20,000,000 in coverage, with a $1,000,000 retention for each Claim against the company (and no retention for each Claim against an Insured Person). The renewed 2011-2012 XL policy provides $15,000,000 in coverage, with the same $1,000,000 retention.

33.    Cobalt supplemented its coverage under the 2010-2011 XL policy by obtaining excess insurance coverage from, among others, Axis. Cobalt's policy with Axis (the "Axis Policy"), policy number MHN749342/01/2010, a true and correct copy of which is attached as Exhibit B, provides an additional $10,000,000 in coverage after $20,000,000 of Loss.

---

[1] Section II of the XL Policies contains the following relevant definitions:

- "Claim" is defined to include, among other things, any "written demand or notice for monetary or non-monetary relief," "civil proceeding," "administrative or regulatory proceeding commenced by a complaint, notice of charges or any similar document," "civil, criminal, administrative or regulatory investigation of an Insured Person once such Insured Person is identified by name in a Wells Notice, notice of charges, formal investigative order, subpoena, target letter or any similar document," and "investigation of the Company for a Company Wrongful Act by the Securities Exchange Commission or any similar state, federal or foreign agency . . . ." Sections II(Q) and III(G) confirm that this definition includes shareholder derivative actions.

- "Loss" is defined to include "damages, judgments, settlements, pre-judgment and post-judgment interest or other amounts" as well as "Defense Expenses in excess of the Retention that the Insured is legally obligated to pay."

- "Defense Expenses" is defined to include "reasonable legal fees and expenses incurred in the defense of any Claim . . . ."

C.     The SEC Begins its Nazaki-Related Investigation

34.     In March 2011, Cobalt disclosed in both its Form 8-K and its Form 10-K that it was aware of allegations concerning a connection between Nazaki and senior Angolan government officials and that the SEC was investigating the allegations.  Cobalt also disclosed that it had voluntarily contacted the DOJ and offered to respond to any requests from the agency.

35.     On October 26, 2011, the SEC issued a non-public Order Directing Private Investigation and Designating Officers to Take Testimony (the "SEC Order"), a copy of which Cobalt received on November 7, 2011.  Cobalt disclosed the SEC Order and Cobalt's cooperation with both the SEC and DOJ investigations in its February 21, 2012 Form 10-K.

36.     Effective December 15, 2011, XL and Cobalt renewed its XL coverage.  A true and correct copy of the renewed XL policy, policy number ELU124020-11, is attached as Exhibit C.

37.     On Sunday, April 15, 2012, the Financial Times published two articles related to the potential connection between Nazaki and Angolan government officials.

38.     On May 8, 2012, Cobalt received an inspection of books and records demand from two purported shareholders.  In response, Cobalt produced a limited set of records subject to a confidentiality agreement.

39.     On July 30, 2012, Cobalt provided XL and Axis[2] with a "notice of Claim and/or notice of circumstances that may give rise to a Claim" (the "First SEC Notice").  Cobalt expressly identified:

    a.    Cobalt's cooperation with the ongoing SEC and DOJ investigations;

    b.    The SEC Order;

    c.    The April 2012 Financial Times articles;

    d.    Internet postings suggesting that several shareholders were considering claims against Cobalt and/or its directors or officers; and

    e.    The May 8, 2012 demand for inspection of books and records.

40.     Cobalt attached a copy of the SEC Order, the Financial Times articles, the Internet postings, and the shareholder demand to the First SEC Notice.

41.     On September 19, 2012, XL sent Cobalt a letter denying coverage on the grounds that XL was not notified "as soon as practicable" after the SEC made a claim against Cobalt.

42.     On November 5, 2012, Cobalt rebutted XL's rationale for denying coverage, stating, among other arguments, that "XL has not been prejudiced by

_____

[2] Cobalt provided notice to Axis each time it notified XL under the XL Policies.

receiving the SEC Order" no later than August 1, 2012 and therefore XL remained obligated to provide coverage under the XL Policies.

43.     On November 12, 2012, XL responded to Cobalt's letter and again denied coverage.

44.     On November 19, 2012, Cobalt responded to XL's repeated improper denials of coverage by reserving all of its rights and remedies with respect to the dispute.

45.     Axis, who was timely notified of these Claims, either already has denied or intends to deny coverage.

D.     Cobalt Obtains Insurance Coverage from Illinois National

46.     On December 15, 2012, Cobalt chose not to renew or to otherwise continue its insurance coverage with XL.  Instead, Cobalt obtained management liability insurance from Illinois National.

47.     Effective December 15, 2012, Illinois National and Cobalt entered into a "Broad Form Management Liability Insurance Policy," policy number 01-499-94-38, a true and correct copy of which is attached as Exhibit D.  Illinois National continued to serve as Cobalt's primary insurer through December 15, 2015.

48.     Section 1 of the Illinois National Policies lists the coverage provided by the policy, which includes "Insured Person Coverage," "Indemnification Of

Insured Person Coverage," and "Organization Coverage." Insured Person Coverage includes "the Loss of any Insured Person that no Organization has indemnified or paid, and that arises from any (1) Claim (including any Insured Person Investigation) made against such Insured Person . . . for any Wrongful Act of such Insured Person; or (2) Pre-Claim Inquiry . . . ." Indemnification of Insured Person Coverage includes "the Loss of an Organization that arises from any (1) Claim (including any Insured Person Investigation) made against any Insured Person . . . for any Wrongful Act of such Insured Person; and (2) Pre-Claim Inquiry . . . ." Organization Coverage includes "the Loss of any Organization: (1) arising from any Securities Claim made against such Organization for any Wrongful Act of such Organization; (2) incurred as Derivative Investigation Costs, subject to a $250,000 aggregate sublimit of liability; or (3) incurred by an Organization or on its behalf by any Executives of the Organization (including through any special committee) as Defense Costs in seeking the dismissal of any Derivative Suit against an Insured."

49. Section 7 of the Illinois National Policies provides that, if a Claim was first made and reported in accordance with the policy's notice requirements, then any Related Claim that is subsequently made and reported in accordance with the

requirements "shall be deemed to have been first made at the time that such previously reported Claim was first made."[3]

50.     Section 9 of the Illinois National Policies provides that, once Illinois National "has received written notice of a Claim or Pre-Claim Inquiry . . . , it shall

---

[3] Section 13 of the Illinois National Policies contains the following relevant definitions:

- "Claim" is defined to include, among other things, "a written demand for monetary, non-monetary or injunctive relief," "a civil . . . proceeding for monetary, non-monetary, or injunctive relief which is commenced by . . . service of a complaint or similar pleading," "an Insured Person Investigation," and "a Derivative Demand."

- "Related Claim" is defined as "a Claim alleging, arising out of, based upon or attributable to any facts or Wrongful Acts that are the same as or related to those that were either: (i) alleged in another Claim made against an Insured; or (ii) the subject of a Pre-Claim Inquiry received by an Insured Person."

- "Insured Person Investigation" is defined to include "any civil, criminal, administrative, or regulatory investigation of an Insured Person . . . once the Insured Person is identified in writing by an Enforcement Body as a target of an investigation that may lead to a criminal, civil, administrative, regulatory or other enforcement proceeding."

- "Derivative Demand" is defined as "a written demand by any shareholder of an Organization upon the board of directors . . . of such Organization to commence a civil action on behalf of the Organization against any Executive of the Organization for any actual or alleged wrongdoing on the part of such Executive."

- "Loss" is defined to include "damages, settlements, judgments," "Defense Costs," "Derivative Investigation Costs," and "Pre-Claim Inquiry Costs."

- "Defense Costs" is defined to include "reasonable and necessary fees, costs and expenses consented to by the Insurer . . . ."

- "Derivative Investigation Costs" is defined to include "reasonable and necessary costs, charges, fees, and expenses consented to by the Insurer and incurred by the Organization . . . in connection with a Derivative Investigation."

- "Derivative Investigation" is defined to include, "after receipt by any Insured of a Claim that is either a Derivative Suit or a Derivative Demand, any investigation conducted by the Organization . . . as to how the Organization should respond."

advance, excess of any applicable Retention, covered Defense Costs or Pre-Claim Inquiry Costs, respectively, on a current basis, but no later than 90 days after the Insurer has received itemized bills for those Defense Costs or Pre-Claim Inquiry Costs."

51.     Endorsement 25 of the 2012-2013 Illinois National policy excludes from coverage the Nazaki Claims (which are instead covered instead by the XL Policies).   Specifically, the Illinois National Policies provide that any Claim or Wrongful Act "[a]rising out of, based upon or attributable to any and all alleged violations of federal securities laws and FCPA oriented around, and with respects to, the relationship between Angolan officials, Nazaki Oil and Gazthe [sic], and Cobalt International Energy Inc." is excluded from coverage (the "Nazaki Exclusion").   This Endorsement provides that Claims related to the Nazaki Claims are also subject to the Nazaki Exclusion.

52.     The Illinois National Policies provide $10,000,000 in coverage, with a $2,500,000 retention for each Claim.   That retention does not apply to Derivative Investigation Costs, which are subject to a $250,000 aggregate sublimit of liability for each policy year.

E.      Cobalt Drills the Lontra Well in Block 20

53.     In 2013, Cobalt, Sonangol, and British Petroleum drilled the Lontra well in Angolan offshore Block 20.

54.     Nazaki did not own an interest in Block 20 and did not participate in the well.

55.     On December 1, 2013, Cobalt announced that its Lontra well "contain[ed] more gas than [its] pre-drill estimates."

F.     Cobalt Renews Its Insurance Coverage with Illinois National

56.     Effective December 15, 2013, Illinois National and Cobalt renewed the Illinois National policy.  A true and correct copy of the 2013-2014 Illinois National policy, policy number 01-739-05-86, is attached as Exhibit E.

57.     Endorsement 34 of the 2013-2014 Illinois National policy includes the Nazaki Exclusion.

G.     The SEC Continues Its Nazaki-Related Investigation

58.     On August 4, 2014, the SEC issued a "Wells Notice" to Cobalt based on the alleged connection between Nazaki and senior Angolan government officials.  (A Wells Notice, named after the Wells Committee of the SEC, is a letter sent by the SEC to inform a person or firm that the SEC is planning to bring an enforcement action against them.)

59.     The Wells Notice stated that SEC staff had "made a preliminary determination to recommend that the Commission file an enforcement action" against Cobalt.

60.     On August 14, 2014, Cobalt notified XL of the SEC's Wells Notice and of Cobalt's intent to make a submission to the SEC in response to the notice (the "Second SEC Notice").  Cobalt also informed XL that a number of law firms had announced related investigations of Cobalt.

61.     On September 8, 2014, XL denied coverage for both the Wells Notice and the SEC investigation.  XL said it was denying coverage because both the Wells Notice and the SEC investigation related back to the SEC Order and therefore, according to XL, "Cobalt did not provide timely notice."

H.     Cobalt Drills the Loengo Well in Block 9

62.     In 2014, Cobalt drilled the Loengo well in Angolan offshore Block 9.

63.     Nazaki initially owned an interest in Block 9, but Nazaki transferred its interest to Sonangol before Cobalt finished drilling operations on the Loengo well.  Cobalt received notification of this transfer on August 26, 2014.

64.     Cobalt finished drilling the Loengo well in October 2014, with only Cobalt and Sonangol owning any interest in the well.

65.     On November 4, 2014, Cobalt announced that the Loengo well "contained neither oil nor gas."  Nazaki had no interest in the well at this time, and played no role in this announcement.

I.     Purported Shareholders File Demands and Lawsuits Against Cobalt

66.    Starting in November 2014, purported Cobalt shareholders brought demands for investigation and/or actions against Cobalt and several of its directors and officers (the "Securities Litigation").

67.    The Securities Litigation consists of the following civil actions brought in state and federal courts:

a. *St. Lucie County Fire District Firefighters' Pension Trust Fund v. Bryant*, Civ. A. No. 4:14-cv-03428 (U.S. District Court for the Southern District of Texas, November 30, 2014);

b. *Neuman v. Cobalt*, Civ. A. No. 4:14-cv-03488 (U.S. District Court for the Southern District of Texas, December 5, 2014) (consolidated with *St. Lucie* into *In re Cobalt International Energy, Inc. Securities Litigation*, Civ. A. No. 4:14-cv-03428, on March 3, 2015);

c. *Ogden v. Bryant*, Civ. A. No. 4:15-cv-00139 (U.S. District Court for the Southern District of Texas, January 16, 2015);

d. *Gaines v. Bryant*, Cause No. 2016-29850 (Harris County District Court, May 6, 2016); and

e. *McDonaugh v. Bryant*, Cause No. 2016-82186 (Harris County District Court, November 29, 2016).

68.     The Securities Litigation also consists of several internal investigation demands:

a.  Ira Gaines as Trustee for Paradise Wire and Cable Defined Benefit Pension Plan (served an initial demand on July 21, 2015 and a supplement on March 8, 2016);

b.  Karen McDonaugh (served on March 21, 2016); and

c.  Michael Hafkey (served on July 11, 2016).

69.     Each of the cases and demands that constitute the Securities Litigation sought relief based on at least one, and usually both, of the following: (1) alleged misrepresentations and omissions about Nazaki's relationship with senior Angolan government officials, and/or (2) alleged public misrepresentations and omissions about the Lontra and Loengo wells.

70.     Cobalt timely notified XL and Illinois National of these Claims and both XL and Illinois National have repeatedly denied coverage.

71.     XL has denied coverage for these Claims on the grounds that, according to XL, Cobalt did not timely notify XL of the Nazaki Claims and that the Well Disclosure Claims were brought against Cobalt after the XL Policy Period, do not relate to the Nazaki Claims, and therefore are covered by Illinois National, not XL.  Axis either has denied or intends to deny coverage for these claims, too.

72.     Illinois National has repeatedly denied coverage for both the Nazaki Claims and the Well Disclosure Claims based on the Nazaki Exclusion.

73.     On January 22, 2015, the SEC informed Cobalt that it had concluded its investigation and did "not intend to recommend an enforcement action by the Commission against Cobalt."

## Cobalt's Causes of Action Against Axis

## Count One – Declaratory Judgment Against Axis

74.     Cobalt incorporates the allegations in the paragraphs above.

75.     Cobalt has incurred and will continue to incur Defense Expenses and Derivative Investigation Expenses due to the circumstances, investigations, and claims described above.

76.     The Axis Policy follows form to the terms and conditions of the 2010-2011 XL policy.  Because Cobalt is entitled to coverage for the Claims described above under the 2010-2011 XL policy, it is therefore also entitled to coverage by Axis.

77.     Pursuant to TCPRC Chapter 37, Cobalt seeks and is entitled to a declaration that Axis must cover the circumstances, investigations, and claims described above.

78.     In accordance with TCPRC § 37.009, Cobalt seeks and is entitled to an equitable and just award of costs and attorney's fees.

<u>Cobalt's Causes of Action Against Illinois National</u>

<u>Count One – Breach of Contract Against Illinois National</u>

79.     Cobalt incorporates the allegations in the paragraphs above.

80.     Cobalt and Illinois National executed a valid and enforceable written contract, effective December 15, 2012, which they renewed on December 15, 2013.

81.     The contract provided that, in exchange for Cobalt's payment of the policy premium, Illinois National would pay on behalf of Cobalt Losses (including Defense Costs) resulting from Claims made against Cobalt and/or its current and former employees, directors, officers, and board members.

82.     Illinois National breached the contract by (1) repeatedly denying coverage to Cobalt for Claims that were not subject to the Nazaki Exclusion and (2) refusing to pay Cobalt's Losses associated with the relevant circumstances, investigations, and claims described above.

83.     As a direct and proximate result of Illinois National's breaches, Cobalt has suffered damages in excess of this Court's jurisdictional limits, and they are increasing.  In accordance with TCPRC § 38.002, Cobalt "presents" its breach of contract claim to Illinois National and demands that Illinois National agree to cover the Well Disclosure Claims and pay the sum of $800,000 to Cobalt within 30 days of this demand.  Cobalt has retained counsel and is entitled to recover its

reasonable attorney's fees and expenses under TCPRC Chapter 38. Illinois National is advised that if it fails to tender the amount demanded within 30 days, Cobalt will seek an award of attorney's fees in accordance with TCPRC Chapter 38.

<u>Count Two – Declaratory Judgment Against Illinois National</u>

84. Cobalt incorporates the allegations in the paragraphs above.

85. Cobalt has incurred and will continue to incur Defense Costs and Derivative Investigation Costs due to the circumstances, investigations, and claims described above.

86. Pursuant to TCPRC Chapter 37, Cobalt seeks and is entitled to a declaration that Illinois National is obligated to pay any additional Loss, including Defense Costs and Derivative Investigation Costs, suffered by Cobalt due to the relevant circumstances, investigations, and claims described above.

87. In accordance with TCPRC § 37.009, Cobalt seeks and is entitled to an equitable and just award of costs and attorney's fees.

<u>Count Three – Violation of the Texas Prompt Payment of Claims Act Against Illinois National</u>

88. Cobalt incorporates the allegations in the paragraphs above.

89. The Texas Prompt Payment of Claims Act requires insurers to, among other things, (1) notify a claimant in writing of acceptance or rejection of a claim

within 15 days, Tex. Ins. Code § 542.056, and (2) pay claims within 60 days of notice from the insured, Tex. Ins. Code § 542.058.

90.     Illinois National failed to provide timely notice of acceptance or rejection in response to the notices sent regarding the following lawsuits and demands: *St. Lucie*, *Neuman*, *Ogden*, *Gaines*, the initial and supplemental Gaines shareholder demands, and the McDonaugh shareholder demand.

91.     Illinois National improperly has denied coverage on all of the Well Disclosure Claims, and therefore has failed to pay these Claims within 60 days of notice from the insured.

92.     As a result of these violations of the Texas Prompt Payment of Claims Act, and in addition to the Losses described above, Illinois National must also pay 18% annual interest under Section 542.060 of the Texas Insurance Code.

Count Four – Violation of Chapter 541 of the Texas Insurance Code and the DTPA
Against Illinois National

93.     Cobalt incorporates the allegations in the paragraphs above.

94.     Illinois National has improperly denied coverage for the Well Disclosure Claims, despite the fact that the Illinois National Policies unambiguously cover those Claims.

95.     In formal correspondence between Cobalt and Illinois National, Illinois National has wrongly insisted that the Well Disclosure Claims fall within the Nazaki Exclusion. This is no more than a bad faith effort to avoid providing

Cobalt the coverage Cobalt is due under the Illinois National Policies. As Cobalt repeatedly has explained to Illinois National, the Well Disclosure Claims are not plausibly subject to the Nazaki Exclusion because they are not related in any way to the relationship between Cobalt, Nazaki, and Angolan government officials:

a. The Lontra well is not related to the Nazaki Claims. Nazaki does not and never did own an interest in this well or even in the surrounding block. Indeed, Nazaki did not participate in this well in any way.

b. The Loengo well is not related to the Nazaki Claims. Nazaki originally owned an interest in the block surrounding the Loengo well, but Nazaki transferred its interest in that block before Cobalt completed drilling operations, and Nazaki was in no way involved in the completion of the well or the subsequent disclosures about production from the Loengo well.

96. Cobalt has provided Illinois National information confirming that the Well Disclosure Claims do not fall within the Nazaki Exclusion. Illinois National is therefore aware that it has wrongly denied coverage, and Illinois National's decision to continue to deny coverage demonstrates bad faith.

97. Illinois National's knowing and bad faith refusal to provide coverage for the Well Disclosure Claims is a direct violation of Chapter 541 of the Texas Insurance Code and the Texas Deceptive Trade Practices-Consumer Protection Act

("DTPA"). Specifically, Illinois National has engaged in the following unfair methods of competition and/or unfair or deceptive acts or practices in the business of insurance, which was a producing cause of Cobalt's damages:

> a. Engaging in unfair settlement practices (Tex. Ins. Code § 541.060); and
>
> b. Misrepresenting an insurance policy (Tex. Ins. Code § 541.061).

98.    Illinois National engaged in the foregoing conduct knowingly and intentionally.

99.    As a result of Illinois National's knowing violation of Sections 541.060 and 541.061 of the Texas Insurance Code and the DTPA, Plaintiff is entitled to recover treble damages.

### Count Five – Breach of Contract Against Illinois National

100.    Cobalt incorporates the allegations in the paragraphs above.

101.    The Illinois National Policies require Illinois National to advance defense costs. Section 9(A)(2) provides:

> Once the Insurer has received written notice of a Claim or Pre-Claim Inquiry under this policy, it shall advance, excess of any applicable Retention, covered Defense Costs or Pre-Claim Inquiry Costs, respectively, on a current basis, but no later than 90 days after the Insurer has received itemized bills for those Defense Costs or Pre-Claim Inquiry Costs.

102.    Cobalt has incurred covered Defense Costs in excess of the Illinois National policy's retention.

103. On July 14, 2017, Cobalt presented a written demand to Illinois National for the advancement of Defense Costs and Pre-Claim Inquiry Costs already incurred in excess of the applicable Retention. Cobalt included in its demand the actual paid and itemized invoices demonstrating the amount owed by Illinois National.

104. Illinois National was contractually obligated to advance the expense costs identified in Cobalt's July 14, 2017 letter no later than October 12, 2017 (90 days after Illinois National received Cobalt's itemized bills for those Defense Costs).

105. In breach of its insurance agreements with Cobalt, Illinois National has refused to advance Defense Costs and Pre-Claim Inquiry Costs.

<u>Conditions Precedent</u>

106. Cobalt satisfied all conditions precedent under the XL Policies and the Illinois National Policies, including, but not limited to, the payment of premiums, notice, and exceedance of any required retention. Therefore, all conditions precedent to Cobalt's claims for relief have been performed or have occurred.

107. Section 12(F)(1) of the Illinois National Policies requires that all disputes or differences arising under or in connection with the policies be submitted to an alternative dispute resolution process of the insured's choosing. Section 12(F)(1) additionally states that, in the event of mediation, either party

shall have the right to commence a judicial proceeding once the mediation has terminated and at least 90 days have passed since its termination.

108.  On May 13, 2016, Cobalt sent a mediation demand letter to Illinois National.  The parties mediated this dispute on September 19, 2016 in Houston, Texas.  On September 20, 2016, the mediator declared that the mediation had "ended in impasse and that the 90 day cooling off period under the policy has begun to run."  90 days have passed since that impasse.

## Jury Demand

109.  Cobalt demands a trial by jury and tenders the appropriate fee with this petition.

## Prayer

110.  Cobalt respectfully requests that the Court enter judgment in favor of Cobalt and against Illinois National:

    a.  Ordering Illinois National to advance Defense Costs and Pre-Claim Inquiry Costs as required by Section 9(A)(2) of the Illinois National policies.

    b.  Awarding Cobalt actual damages, punitive damages, costs and attorney's fees, all other costs and expenses as allowed by law, and pre- and post-judgment interest at the maximum legal rate.

c.  Awarding Cobalt treble damages pursuant to Section 541.152 of the Texas Insurance Code and Section 17.50 of the DTPA.

d.  Awarding Cobalt 18% annual interest pursuant to the Texas Prompt Payment of Claims Act.

e.  Declaring that Illinois National is obligated to pay any additional Loss, including Defense Costs and Derivative Investigation Costs, suffered by Cobalt due to the circumstances, investigations, and claims described above.

f.  Awarding Cobalt all other relief, legal and equitable, to which Cobalt is justly entitled.

111.  Cobalt respectfully requests that the Court enter judgment in favor of Cobalt and against Axis:

a.  Declaring that Axis is obligated to cover the Claims described above.

b.  Awarding Cobalt all other relief, legal and equitable, to which Cobalt is justly entitled.

Dated: November 1, 2017

Respectfully submitted,

By: */s/ Eric J. Mayer*
Eric J. Mayer
Texas State Bar No. 13274675
Federal ID No. 09698
emayer@susmangodfrey.com
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 653-7810
Fax: (713) 654-6666

OF COUNSEL:
Shawn L. Raymond
Texas State Bar No. 24009236
Federal ID No. 26202
sraymond@susmangodfrey.com
Adam Carlis
Texas State Bar No. 24085237
Federal ID No. 1618804
acarlis@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 653-7810
Fax: (713) 654-6666
**ATTORNEYS FOR COBALT
INTERNATIONAL ENERGY, INC.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a true and correct copy of the foregoing document has been served electronically via the Court's CM/ECF system on Wednesday, November 01, 2017 on all current counsel of record.

*/s/ Eric J. Mayer*
Eric J. Mayer